**The STATE of Texas, Appellant,**

v.

**Gabino Puente IBARRA, Appellee.**

**No. 1360–95.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 10, 1997.

---

Ed D. Lieck, Beaumont, for appellant.

Steve Greene, Assistant District Attorney, Anahuac, Matthew Paul, State's Atty., Austin, for State.

Before the court en banc.

*OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW*

MEYERS, Judge.

Texas law provides that, with few exceptions, the State must obtain a warrant before searching the place or possessions of a citizen. This requirement follows directly from our constitution, which demands that:

> The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation.

TEX. CONST. ART. I, § 9. One exception to the warrant requirement involves those searches that occur by way of voluntary consent. *Juarez v. State,* 758 S.W.2d 772, 776 (Tex. Crim.App.1988). When challenged, however, the State must demonstrate the voluntariness of this consent by clear and convincing evidence. *Paprskar v. State,* 484 S.W.2d 731, 737 (Tex.Crim.App.1972).

Here, appellee was charged with possession of between two and fifty pounds of marijuana and failure to pay marijuana tax. Appellee moved to suppress evidence obtained during the search of his car on the ground that he did not voluntarily consent to the search. The trial court granted appellee's motion, finding that the State had proven the voluntariness of appellee's consent by a preponderance of the evidence but not by the requisite clear and convincing evidence. The Houston Court of Appeals affirmed, rejecting the State's argument that the Texas Constitution, like the United States Constitution, demands only that the State prove voluntariness of consent by a preponderance of the evidence. *State v. Ibarra,* 918 S.W.2d 15 (Tex.App.—Houston [14th Dist.] 1995)(do not publish). We granted discretionary review to decide whether the court of appeals erred in its determination.

The State does not dispute that, under our constitution, we have repeatedly held it to a standard of clear and convincing evidence when attempting to show the voluntariness of a consent to search. *See Dubose v. State,* 915 S.W.2d 493, 496 (Tex.Crim.App.1996); *Juarez v. State,* 758 S.W.2d at 775; *Paprskar,* 484 S.W.2d at 737. Rather, the State advocates that we reevaluate our position under the Texas Constitution in light of the fact that the Supreme Court requires only that voluntariness be shown by a preponderance of the evidence under the United States Constitution. *United States v. Matlock,* 415 U.S. 164, 176–78, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974). In asking us to reconcile our law with federal law, the State employs the five part test set out in *Autran v. State,* 887 S.W.2d 31, 36 (Tex.Crim.App. 1994), which considers not only the text of the state constitutional provision, but also the history, framer's intent and possible policy

considerations behind it and, finally, comparable jurisprudence from other states. Appellee applies the same test in asking us to adhere to the higher standard of clear and convincing evidence.

■ At the outset, we emphasize that although "we need not construe the Texas Constitution differently [from the federal constitution], there is simply no getting around the fact that we construe it independently." *Bauder v. State,* 921 S.W.2d 696, 700 (Tex.Crim.App.1996)(Clinton, J., concurring). Indeed, it seems odd to suggest that the measure of our state constitutional rights stems not from an independent assessment of our constitution but, rather, from the way in which our constitutional provisions are similar to or different from their federal counterparts. So, while Supreme Court analysis of federal constitutional provisions may enlighten our own constitutional endeavors, we are not bound by those interpretations.

Even so, the test set out in *Autran* may serve well as a mechanism by which to independently construe our own constitution. Much like the factors set out in *Boykin v. State,* 818 S.W.2d 782 (Tex.Crim.App.1991), that apply when a statute's text is ambiguous or leads to absurd results, the *Autran* factors may help illuminate the intended scope of constitutional provisions. But in this case, neither party makes especially compelling arguments regarding the text of art. I, § 9, the framer's intent as to that provision or comparable jurisprudence from other states. *See* GEORGE E. DIX & ROBERT O. DAWSON, 40 TEXAS CRIMINAL PRACTICE AND PROCEDURE § 5.03. As for the history and application of art. I, § 9 in this context, the State concedes that a ruling today that would allow

the State to constitutionally show voluntariness of consent by a preponderance of the evidence would undermine years of well-established precedent that has demanded proof by clear and convincing evidence.

It is against this backdrop that we discern which party's policy arguments more fully support the art. I, § 9 mandate against unreasonable searches and seizures. The State asserts that a preponderance of the evidence standard sufficiently deters police officers from violating the constitution, but, at the same time, accommodates the fact that police officers must often make accelerated decisions regarding searches and seizures. Appellee avers that the State's suggested departure from the current standard of clear and convincing evidence will necessarily allow "more evidence of the purported consent than would be admitted were the prosecution required to meet a higher standard", thereby diminishing art. I, § 9 protections. The Supreme Court encountered some of these same arguments in *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), and decided that the voluntariness of a confession need only be proven by a preponderance of the evidence. In so holding, the Court opined that "no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence." *Id.* at 488, 92 S.Ct. at 626. But the Court specifically added that:

> [T]he States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake.

*Id.* at 489, 92 S.Ct. at 627. And in Texas we have done just that.[1] It would be naive to

---

1. The Texas cases which adhere to the higher standard of clear and convincing evidence rely in part on *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The State argues that this reliance is misplaced since *Bumper* actually never set the burden at clear and convincing evidence and, even if it did, later Supreme Court cases construing the federal constitution clearly set the standard at a preponderance of the evidence. Specifically, the State cites the seminal Texas case of *Paprskar v. State,* 484 S.W.2d 731, 737 (Tex.Crim.App.1972), which holds that "the burden of proof by clear and

convincing evidence is upon the prosecution to show that the consent was freely and voluntarily given." It seems unnecessary to decide whether *Bumper* actually set the standard at clear and convincing evidence because the *Paprskar* Court did not rely solely on that case. In fact, it also relied extensively on Texas case law, decided prior to *Bumper,* as well as a portion from Tex. Jur.2d, which states that:

> Consent to search is not to be lightly inferred. It should be shown by clear and convincing evidence, and any consent must be voluntary

assume that this Court, in so doing, did not know about the Supreme Court jurisprudence adopting a preponderance of the evidence standard. A more believable supposition would be that this Court, well aware that the Supreme Court has held that the burden of preponderance of the evidence does not offend the Fourth Amendment, nevertheless concluded that the same burden does not satisfy the demands of art. I, § 9. In our view, this disparity is justified by the fact that:

> [A] lower standard of proof will necessarily result in the admission of more involuntary confessions than would be admitted were the prosecution required to meet a higher standard.

*Lego v. Twomey,* 404 U.S. at 493, 92 S.Ct. at 628 (1972)(Brennan, J., dissenting).

As appellee deftly points out, the admission of involuntary confessions into evidence may occur even more frequently in a border state like Texas were we to lower the standard of proof to a preponderance of the evidence. Indeed, free and voluntary consent may come with more difficulty to those who, like many Texas immigrants, have a limited understanding of the English language.

■ In the end, the State does not offer us, nor can we see, any compelling reason to depart from the standard of proof we have heretofore demanded that the State meet when showing the voluntariness of a consent to search. As we see it, holding that the State need merely prove the voluntariness of a consent by a preponderance of the evidence would not lend "concrete substance" to the mandate of art. I, § 9.[2] *Id.* at 493, 92 S.Ct. at 629. We thus hold, as we consistently have, that the State must prove the voluntariness of a consent to search by clear and convincing evidence.

> and neither physically nor psychologically coereced ...
>
> *Paprskar,* 484 S.W.2d at 737, *citing* 51 Tex. Jur.2d, Rev., Part 1, Searches and Seizures § 42, p. 722.

**2.** Such a holding would also be an anomaly in our law. We have consistently treated our constitutional rights with the utmost sanctity. For example, both the right to the assistance of coun-

The judgment of the court of appeals is affirmed.

WOMACK, J., dissents.

MANSFIELD, Judge, concurring.

For nearly twenty-five years, the law in Texas has been that where the State has alleged a search was conducted after voluntary consent was given, the State, if challenged, must show, *by clear and convincing evidence,* the consent was voluntarily given. *Paprskar v. State,* 484 S.W.2d 731, 737 (Tex. Crim.App.1972). *Paprskar* relies, at least in part, on the Supreme Court's holding in *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) which established the clear and convincing evidence standard the State must meet to show voluntary consent to a search was given in order to satisfy federal constitutional requisites. Subsequent to our holding in *Paprskar,* the Supreme Court lowered the clear and convincing standard to a preponderance of the evidence standard, applicable in determining whether a confession was voluntarily given under the Fourth Amendment. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The preponderance of the evidence standard has been made applicable in determining, for Fourth Amendment purposes, whether voluntary consent was given to a search, in effect, overruling *Bumper v. North Carolina. Bourjaily v. United States,* 483 U.S. 171, 175–77, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987); *United States v. Matlock,* 415 U.S. 164, 177–78, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).

"Of course the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." *Lego v. Twomey,* 404 U.S. at 489, 92 S.Ct. at 627.

sel and the right to a jury trial must be expressly waived—in writing and on the record. This, because they "are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in our system." *Marin v. State,* 851 S.W.2d 275, 278 (Tex.Crim.App.1993). Surely, we ought to hold the right to be free from unreasonable searches and seizures in equal esteem.

I have never been persuaded that the framers of the Texas Constitution intended to provide rights and protections to those accused of criminal offenses beyond those provided by the United States Constitution. As stated—correctly—in *Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App.1991), we are not barred by the federal constitution from finding the Texas Constitution provides greater rights to criminal defendants than does its federal counterpart. Yet, with the exception of *Bauder v. State*, 921 S.W.2d 696 (Tex.Crim.App.1996) (Mansfield, J., dissenting) (interpreting the double jeopardy clause of the Texas Constitution more broadly than the federal double jeopardy clause with respect to barring retrial after mistrial resulting from reckless/intentional State conduct), the majority of this Court has refrained from doing so despite several opportunities to so hold.

Although I personally agree with the State (and with the dissent) that the preponderance of the evidence standard is the better standard, to adopt it now, after demurring for twenty-five years, would do violence to the principle of *stare decisis.*

> *Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right.

$$* \quad * \quad * \quad * \quad * \quad *$$

When may a precedent be properly overruled? This is a difficult question to answer, but we may be confident in the assumption that a precedent may not properly be overruled simply because a majority of the Court believes it to be error. If the rule were otherwise, then no precedent would be safe and our law could change after every change in Court personnel. The situation would be intolerable if the periodic changes in the composition of the Court were accompanied by changes in its rulings.

---

1. The Legislature, of course, is free to overrule *Paprskar.* It may be significant that it has not done so despite having met over ten times since *Paprskar* was delivered.

---

1. *Heitman v. State,* 815 S.W.2d 681 (Tex.Cr.App. 1991).

*Garrett v. State,* 851 S.W.2d 853, 862–863 (Tex.Crim.App.1993) (Campbell, J., dissenting).

*Stare decisis* compels us to overrule precedent only where the reasons for doing so are compelling, i.e., it has become clear that the precedent has become unworkable or has led to injustice. In my opinion, the State has not met its burden of persuasion in this regard. The State's brief does not allege, much less prove, that our holding in *Paprskar* has become an unworkable obstacle for law enforcement or that it has led to significant numbers of individuals escaping prosecution. The State does not persuade me that a significantly greater number of successful prosecutions would have occurred had the preponderance of the evidence standard, rather than the clear and convincing evidence standard, been applicable at hearings on motions to suppress evidence where the issue is whether or not consent to a search was voluntarily given.[1]

Because I believe the principle of *stare decisis* requires me to do so, I concur in the opinion of the Court.

### McCORMICK, Presiding Judge, dissenting.

I respectfully dissent. The majority casts this case as another *Heitman*[1] case in which the majority holds, as a matter of state constitutional law, that the prosecution must prove to the trial court the voluntariness of a consent to search by clear and convincing evidence.

Before addressing the particulars of the majority opinion and the issue presented in this case, I set out an overview of the approach I believe this Court should adopt in "interpreting" the Texas Constitution. The federal Bill of Rights contained in the United States Constitution originally was and still is intended to protect our rights set out therein against federal action.[2] The states have

---

2. Most of the United States Constitution is devoted to the division of power between the various branches of the federal government and the states with the states retaining the powers not specifically granted to the federal government in the federal constitution. See U.S. Const., Amend. X. The federal Bill of Rights occupies a

their own constitutions that secure essentially the same rights against state action.

That the state and federal constitutions intend to guarantee essentially the same rights should not be open to much debate. Even *Heitman* recognizes this. See *Heitman*, 815 S.W.2d at 682. Consistent with principles of federalism, the point is and always has been that the federal Bill of Rights would not be applicable to the states. The issue is not really how these constitutional provisions should be interpreted; the issue devolves into one of power. See *Bauder v. State*, 921 S.W.2d 696, 706–07 (Tex.Cr.App. 1996) (McCormick, P.J., dissenting). Are the states free to apply their state law without federal intrusion in areas that traditionally had been reserved *solely* to the states, or are the states bound by a "Procrustean bed of federal precedents" in these areas? See *Mapp v. Ohio*, 367 U.S. 643, 679, 81 S.Ct. 1684, 1705, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting).

Shortly after the war between the states, the Fourteenth Amendment was adopted as part of the United States Constitution. The Fourteenth Amendment is a federal guarantee directed to state action and it essentially provides that a state may not deprive a citizen of "life, liberty or property" without "due process of law." See *Malloy v. Hogan*, 378 U.S. 1, 13–37, 25–27 84 S.Ct. 1489, 1496–1509, 1502–04, 12 L.Ed.2d 653, 663–77, 670 (1964) (Harlan, J., dissenting) ("due process of law" is secured against invasion by the federal government by the Fifth Amendment, and is safeguarded against state action in identical words by the Fourteenth Amendment). The history and especially the timing of the Fourteenth Amendment indicate it originally was intended to protect the rights of black Americans from arbitrary and capricious state action. See, e.g., *Plessy v. Ferguson*, 163 U.S. 537, 542–44, 16 S.Ct. 1138, 1140, 41 L.Ed. 256 (1896), and at 554–57, 16 S.Ct. at 1145 (Harlan, J., dissenting) (object of the Fourteenth Amendment was undoubtedly to enforce the absolute equality of the two races before the law); *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880) (Fourteenth Amendment intended to protect an emancipated race and to strike down all legal discriminations against those who belong to it); *Casarez v. State*, 913 S.W.2d 468, 484 fn. 9 (Tex. Cr.App.1994) (McCormick, P.J., dissenting) (op. on orig. submission).

Consistent with principles of federalism, the due process clause of the Fourteenth Amendment never was intended to make the first eight amendments to the United States Constitution (the federal Bill of Rights) "as such" applicable to the states. See *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (what the due process clause of the Fourteenth Amendment requires of the states does not basically depend on what the first eight amendments to the federal constitution requires of the federal government); see also *Malloy*, 378 U.S. at 13–38, 25–27, 84 S.Ct. at 1496–1509, 1502–04, 12 L.Ed.2d at 663–77, 670 (Harlan, J., dissenting) ("due process of law" formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the federal Bill of Rights); *Mapp*, 367 U.S. at 677–69, 682–83, 81 S.Ct. at 1704, 1706 (Harlan, J., dissenting) (federal courts review state procedures against the flexible contours of the due process clause of the Fourteenth Amendment and not against the specific substantive commands of the Fourth Amendment). *Palko* cites several cases which decided the Fourteenth Amendment did not prohibit the states from doing certain things that the United States Constitution prohibited the federal government from doing. See *Palko*, 302 U.S. at 323–25, 58 S.Ct. at 151–52 (e.g., Fourteenth Amendment would not prohibit a state from abolishing the right of an accused against compelled incrimination by "orderly inquiry" because this right is not "of the very essence of a scheme of ordered liberty" and it could be lost and justice still be done).

small portion of the United States Constitution. The most fundamental right our Founders bestowed upon us was the right to decide for ourselves through the political process how we will order our affairs. The federal Bill of Rights was

intended to grant few, but precious, rights which are not subject to the political process. The rights granted to us in the federal Bill of Rights are for the most part self-explanatory.

However, in recent times the federal courts have used the Fourteenth Amendment in more ways than one to greatly expand federal power into areas that traditionally had been reserved *solely* to the states.[3] The federal courts have used the due process clause of the Fourteenth Amendment to make most of the provisions of the federal Bill of Rights applicable to every state in the country effectively intruding upon areas that traditionally had been left *solely* to each state to decide under its constitution. See, e.g., *Malloy*, 378 U.S. at 13–34, 15–17, 84 S.Ct. at 1496–1507, 1497–99, 12 L.Ed.2d at 663–74, 664 (Harlan, J., dissenting) (result of such an approach to due process is "compelled uniformity" which is inconsistent with principles of federalism); *Mapp*, 367 U.S. at 672–85, 81 S.Ct. at 1701–08 (Harlan, J., dissenting).

The federal courts also have applied the Fourteenth Amendment to areas which it never was originally intended to apply also intruding upon areas that traditionally had been left *solely* to each state to decide under its state law. See *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 150–52, 114 S.Ct. 1419, 1433, 128 L.Ed.2d 89 (1994) (Kennedy, J., concurring) (much time passed before the Fourteenth Amendment was thought to reach beyond the purpose of prohibiting racial discrimination). This may explain why the federal courts have never attempted to define with precision the words "'due process of law.'" See *Malloy*, 378 U.S. at 21–23, 84 S.Ct. at 1500–02, 12 L.Ed.2d at 668 (Harlan, J., dissenting).

And, the federal courts, claiming to interpret the Fourteenth Amendment have, mostly through the use of an oxymoron called "substantive due process,"[4] simply imposed their personal policy preferences upon the whole country in many of these areas taking these matters out of the realm of each state's political process for its citizens to decide or

3. United States Supreme Court cases decided shortly after the adoption of the Fourteenth Amendment took a much narrower view than they do now of what constitutes "due process of law." See, e.g., *Howard v. Kentucky*, 200 U.S. 164, 170–72, 26 S.Ct. 189, 190–91, 50 L.Ed. 421 (1905); *Missouri Pac. Ry. v. Humes*, 115 U.S. 512, 519–22, 6 S.Ct. 110, 112–13, 29 L.Ed. 463 (1885) (if the laws enacted by a state be within the legitimate sphere of legislative power, and their enforcement be attended with the observance of those general rules which our system of jurisprudence prescribes for the security of private rights, the harshness, injustice, and oppressive character of such laws will not invalidate them as affecting life, liberty, or property without due process of law). One of the best examples I have found of an application of the due process clause as it was originally intended to apply is contained in *Ex parte Converse*, 137 U.S. 624, 630–32, 11 S.Ct. 191, 193, 34 L.Ed. 796 (1891). In that case, the Court applied the concept of "due process of law" as follows:

"Appellant has been subjected, as all persons within the state of Michigan are, to the law in its regular course of administration through courts of justice, and it is impossible to hold that a judgment so arrived at is such an unrestrained and arbitrary exercise of power as to be utterly void. We repeat, as has been so often said before, that the fourteenth amendment undoubtedly forbids any arbitrary deprivation of life, liberty, or property, and, in the administration of criminal justice, requires that no different or higher punishment shall be imposed on one than is imposed on all for like offenses, but it was not designed to interfere

with the power of the state to protect the lives, liberty, and property of its citizens, nor with the exercise of that power in the adjudications of the courts of a state in administering the process provided by the law of the state. The supreme court of Michigan did not exceed its jurisdiction, or deliver a judgment abridging appellant's privileges or immunities, or depriving him of the law of the land of his domicile. (Citations Omitted)."

4. The federal courts have stated that "substantive due process" prevents the government from engaging in conduct that "shocks the conscience" or interfering with rights "implicit in the concept of ordered liberty." See *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). However, United States Supreme Court cases decided shortly after the adoption of the Fourteenth Amendment have stated this is a "strange misconception of the scope" of the Fourteenth Amendment. See *Humes*, 115 U.S. at 520, 6 S.Ct. at 112:

"But, from the number of instances in which [the Fourteenth Amendment is] invoked to set aside the legislation of the states, there is abundant evidence, as observed by Mr. Justice Miller, in the case referred to, 'that there exists some strange misconception of the scope of this provision, as found in the fourteenth amendment.' It seems, as he states, to be looked upon 'as a means of bringing to the test of the decision of this court the abstract opinions of every unsuccessful litigant in a state court of the justice of the decision against him, and of the merits of the legislation on which such a decision may be founded.'"

each state's judicial process for its courts to decide. See, e.g., *Jackson v. Denno*, 378 U.S. 368, 426–28, 84 S.Ct. 1774, 1807, 12 L.Ed.2d 908 (1964) (Harlan, J., dissenting);[5] see also *Gideon v. Wainwright*, 372 U.S. 335, 335–46, 83 S.Ct. 792, 792–97, 9 L.Ed.2d 799 (1963) (federal constitution requires a state to furnish lawyers to indigent criminals accused of serious crimes against its citizens); but see *Scott v. Illinois*, 440 U.S. 367, 369–71, 99 S.Ct. 1158, 1160, 59 L.Ed.2d 383 (1979) (there is considerable doubt that the Sixth Amendment itself, as originally drafted by the Framers of the Bill of Rights, contemplated any guarantee other than the right of an accused in a criminal prosecution in a federal court to employ a lawyer to assist in his defense).[6] The federal approach to constitutional interpretation has wreaked havoc in the realm of state criminal law enforcement, is inconsistent with principles of federalism by upsetting the proper balance between state and federal responsibility in the administration of criminal justice, and represents a serious threat to our liberty and freedom.[7] See *Malloy*, 378 U.S. at 13–17, 84 S.Ct. at 1496–99, 12 L.Ed.2d at 663–64 (Harlan, J., dissenting) (reasoning behind the Court's decision carried "extremely mischievous, if not dangerous, consequences for our federal system in the realm of criminal law enforcement" with the result being "compelled uniformity" and disregard of all relevant differences which may exist between state and federal criminal law enforcement); *Mapp*, 367 U.S. at 679–81, 81 S.Ct. at 1705 (Harlan J., dissenting) (preservation of a proper balance between state and federal responsibility in the administration of criminal justice demands patience on the part of those who want the states to conform to their views of how things ought to be).

Because of these federal developments, I have taken the position that the federalization of this State's criminal law and the vast expansion of federal power into areas that traditionally had been reserved *solely* to the states preempt any "independent" state constitutional analysis. See *Bauder*, 921 S.W.2d at 706–07 (McCormick, P.J., dissenting). As the foregoing discussion illustrates, Texas is not really "independent" as we are compelled to follow a "Procrustean bed of federal precedents" in these areas. *Mapp*, 367 U.S. at 679, 81 S.Ct. at 1705 (Harlan, J., dissenting); compare *Bauder*, 921 S.W.2d at 700–01 (Clinton, J., concurring), *with*, *Bauder*, 921 S.W.2d at 706–07 (McCormick, P.J., dissenting). When the majority says this Court will "independently" interpret the Texas Consti-

---

**5.** Justice Black's dissenting opinion in *Jackson v. Denno* correctly summarizes the problem as follows:

"My wide difference with the Court is in its apparent holding that it has constitutional power to change state trial procedures because of its belief that they are not fair. There is no constitutional provision which gives the Court any such law-making power. I assume, although the Court's opinion is not clear on this point, that the basis for its holding is the 'due process of law' clause of the Fourteenth Amendment. *The Court appears to follow a judicial philosophy which has relied on that clause to strike down laws and procedures in many fields because of a judicial belief that they are 'unfair,' are contrary to 'the concept of ordered liberty,' 'shock the conscience,' or come within various other vague but appealing catch phrases. (Citations Omitted)."* See *Jackson*, 378 U.S. at 407, 84 S.Ct. at 1797 (Black, J., dissenting). (Emphasis Supplied).

**6.** Another example, in *Furman v. Georgia* at least two justices of the United States Supreme Court would have held the death penalty in all cases violates the United States Constitution un-

der the "shocks the conscience" standard even though the "plain" language of the Fourteenth Amendment expressly says otherwise. See *Furman v. Georgia*, 408 U.S. 238, 257–305, 92 S.Ct. 2726, 2736–60, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring) and at 314–73, 360–61, 92 S.Ct. at 2765–95, 2788 (Marshall, J., concurring) (death penalty is in all circumstances for all crimes unconstitutional because it " *'shocks the conscience and sense of justice of the people'* ") (emphasis supplied); but see U.S. Const., Amend. XIV (state may not deprive a citizen of *"life,* liberty or property" without "due process of law") (emphasis supplied).

**7.** See, e.g., *Jackson v. Denno*, 378 U.S. at 405–06, 84 S.Ct. at 1796 (Black, J., dissenting) (today's holding means that hundreds of prisoners in New York state have been convicted after the kind of trial which the Court now says is unconstitutional; the disruptive effect which today's decision will have on the administration of criminal justice throughout the country will undoubtedly be great, and before the Court's decision is even a day old, the Court relies on it to vacate convictions in 11 cases from Arizona, Pennsylvania, *Texas*, New York and the District of Columbia).

tution, they fail to appreciate the significance of the federal developments previously discussed.

Given these federal developments, it is a pointless exercise to "independently" interpret our constitution. Under this Court's past approaches to state constitutional interpretation, this can only have the effect of further increasing the rights of criminal defendants in addition to the explosion of rights for criminal defendants we saw in the 1950s and 1960s by the federal courts. See *Bauder*, 921 S.W.2d at 706.[8] Now is the time to be exercising judicial restraint. See *Autran*, 887 S.W.2d at 43 (McCormick, P.J., dissenting).

The approach to state constitutional "interpretation" I advocate also is preferable to the majority's approach because my approach gives police and prosecutors clear notice of the "parameters within which they can legally operate," and it fairly protects the rights of criminal defendants. See *Bauder*, 921 S.W.2d at 706 (McCormick, P.J., dissenting). Such an approach also has practical benefits. See *id.* Under this approach, trial and appellate courts in cases like this would have to apply only one substantive rule with a single burden of proof. Under the majority's approach, trial and appellate courts have to apply two substantive rules with different burdens of proof with no difference in the final results in the vast majority of cases. This is an inefficient use of valuable resources.

Notwithstanding the foregoing, the issue in this case does not present a constitutional question. The issue in this case presents a preliminary question of admissibility. Arti-

cle I, Section 9, of the Texas Constitution, like the Fourth Amendment to the federal constitution, protects us from unreasonable searches and seizures by the government. When we are called upon to interpret our constitution, our duty is to give effect to the intent of the voters who adopted it whether we agree with their policy choices or not. See *Lanford v. Fourteenth Court of Appeals*, 847 S.W.2d 581, 585 (Tex.Cr.App.1993). There is no evidence the voters voted for any burden of proof in Article I, Section 9. That does not mean courts are powerless to fashion a burden of proof upon a particular party as courts traditionally have done in the absence of contrary legislative authority. However, courts do this to carry out the policy expressed in the constitutional provision at issue. Courts do not do this as part of the constitutional provision itself.

Citing what it characterizes as the "seminal Texas case" of *Paprskar v. State*, the majority claims it has been well-settled in Texas that the prosecution must prove to the trial court the voluntariness of a consent to search by clear and convincing evidence. See *Paprskar v. State*, 484 S.W.2d 731, 737 (Tex.Cr.App.1972) (prosecution must prove by clear and convincing evidence that consent was freely and voluntarily given). The majority recognizes that *Paprskar* relied in part on the United States Supreme Court's decision in *Bumper v. North Carolina* for this rule. See *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).[9]

The State argues *Bumper* never set "the burden at clear and convincing evidence and,

---

8.  Moreover, it also is likely that our constitution actually provides less protection than what the federal constitution provides on matters of common subject. See *Bauder*, 921 S.W.2d at 706 fn. 5 (McCormick, P.J., dissenting); *Heitman v. State: The Question Left Unanswered*, 23 St. Mary's L.J. 929, 956–74 (1992) (and authorities cited therein).

9.  It is not even clear whether *Paprskar* was interpreting our constitution. See *Paprskar*, 484 S.W.2d at 737. But, if it was, it is clear it was relying at least in part on United States Supreme Court precedent in doing so. See *id.* It is curious the majority recognizes that this Court in *Paprskar* relied in part on United States Supreme

Court precedent for the clear and convincing evidence standard, yet the majority refuses to follow United States Supreme Court precedent when it comes to deciding whether to abandon this standard and adopt the lower preponderance of the evidence standard. If this Court has relied on United States Supreme Court precedent for the higher standard, then why does it not now rely on United States Supreme Court precedent for the lower standard in this first case here to present the issue since the United States Supreme Court lowered the standard? And, if the issue is so well-settled, then why did the Court grant the petition for discretionary review in this case?

.

even if it did, later Supreme Court cases construing the federal constitution clearly set the standard at a preponderance of the evidence." The majority claims it is unnecessary to decide whether *Bumper* actually set the standard at clear and convincing evidence because *Paprskar* also relied extensively on Texas case law decided prior to *Bumper* for the clear and convincing evidence standard.

While it is true *Paprskar* also relied on and cited Texas case law which required the prosecution to prove the voluntariness of a consent to search, these cases were silent on the prosecution's burden of proof before the trial court. See *Compton v. State*, 148 Tex. Crim. 204, 186 S.W.2d 74, 76 (1945) (burden of proving consent to search rests upon the prosecution); *Scott v. State*, 139 Tex.Crim. 210, 139 S.W.2d 787, 788 (1940) (*jury* should have been instructed to give defendant the benefit of reasonable doubt on the issue of consent to search); *Frazier v. State*, 119 Tex.Crim. 217, 43 S.W.2d 597, 599–600 (1931). The Texas cases upon which *Paprskar* relied do not support the proposition for which they are cited in *Paprskar* and in this case.

*Scott* and *Frazier* also dealt with the prosecution's burden of proving to the jury the voluntariness of a consent to search and not, as here, the prosecution's burden of proving to the trial court the voluntariness of a consent to search. See *Scott*, 139 S.W.2d at 788 (jury should have been instructed to give defendant the benefit of reasonable doubt on issue of consent); *Frazier*, 43 S.W.2d at 599 (jury instructed to acquit defendant if it had reasonable doubt on whether he consented to search); cf. *Compton*, 186 S.W.2d at 76 (prosecution presented uncontroverted evidence of defendant's consent; therefore, trial court was not required to submit the issue to the jury and instruct the jury to give defendant the benefit of reasonable doubt on the issue). Therefore, it should not be considered so well-settled in Texas that the prosecution must prove to the trial court the vol-

untariness of a consent to search by clear and convincing evidence.[10]

The majority's approach to the question presented in this case also is apparently based on policy. They decline to follow *United States v. Matlock* which placed the burden on the prosecution to prove to the trial court the voluntariness of a consent to search by a preponderance of the evidence. See *United States v. Matlock*, 415 U.S. 164, 177–78, 94 S.Ct. 988, 996–97, 39 L.Ed.2d 242 (1974). And, the majority declines to adopt the federal rationale set out in *Lego v. Twomey* for rejecting the claim that the prosecution should have a higher burden to prove the voluntariness of a confession. See *Lego v. Twomey*, 404 U.S. 477, 488–89, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (prosecution must prove the voluntariness of a confession by a preponderance of the evidence).

However, the majority wholly fails to address why the federal rationale set out in *Lego* should not also be adopted as a matter of state law. In *Lego*, the Supreme Court declined to escalate the prosecution's burden to prove the voluntariness of a confession for the following reasons:

"Without good cause, we are unwilling to expand currently applicable exclusionary rules by *erecting additional barriers to placing truthful and probative evidence before state juries* and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in Fourth and Fifth Amendment suppression hearings would be sufficient productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or inno-

10. The majority also cites *Juarez v. State* for the proposition that the prosecution must prove the voluntariness of a consent to search by clear and convincing evidence. See *Juarez v. State*, 758 S.W.2d 772, 775 (Tex.Cr.App.1988). However, *Juarez* relied on *Paprskar* and the same authorities upon which *Paprskar* relied. These authorities do not support the proposition for which they are cited in *Juarez*, *Paprskar* and the majority opinion in this case.

cence." *Lego,* 404 U.S. at 488–89, 92 S.Ct. at 626. (Emphasis Supplied).

The majority does not explain why it is necessary, as a matter of state law, to continue to have "additional barriers to placing truthful and probative evidence" before the jury. See *id.* The majority does not tell us why imposing a higher burden on the prosecution to prove to the trial court the voluntariness of a consent to search outweighs "the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." See *id.* The majority also does not say how their holding will result in appreciable deterrence of lawless conduct by police and prosecutors. See *id.*[11] However, this is what happens when the majority continues to follow an approach to constitutional interpretation that completely *exalts* the rights of criminal defendants over the rights of law-abiding citizens instead of an approach that *balances* these often competing interests. See *Bauder,* 921 S.W.2d at 705 (McCormick, P.J., dissenting).

If this Court must "independently" interpret our constitution, I would adopt the holding of *Matlock* and the reasoning of *Lego.* *Lego* at least attempts to balance the interests of criminal defendants against the interests of society.

In addition, our statutes provide more protection than the federal constitution provides by permitting both judge and jury to pass upon the admissibility of evidence when a claim is made that it was obtained "in violation of the law." See Article 38.23(a), V.A.C.C.P.; Article 38.22, Section 6, V.A.C.C.P; see also *Lego,* 404 U.S. at 489–90, 92 S.Ct. at 626–27 (federal constitution does not require that both judge and jury pass upon the admissibility of evidence when constitutional grounds are asserted for excluding it). And, if the issue is submitted to the jury, these statutes further provide that the jury must find *beyond a reasonable doubt* that the evidence was legally obtained. See Article 38.23(a); Article 38.22, Section 6.

Under these circumstances, the prosecution should be permitted to prove to the trial court the voluntariness of a consent to search by a preponderance of the evidence. This strikes a proper balance between all competing interests. And, contrary to the position taken by a majority of the United States Supreme Court in *Jackson v. Denno,* I also trust juries to make these determinations fairly and accurately.

This brings us once again to *Jackson v. Denno.* In that case, the United States Supreme Court decided about one-third of the states' procedures for determining the voluntariness of a confession (the New York rule) violated the due process clause of the Fourteenth Amendment. See *Jackson v. Denno,* 378 U.S. at 369–97, 84 S.Ct. at 1777–91.[12] The procedure struck down in *Jackson v. Denno* provided that if there existed a factual dispute as to the voluntariness of a confession, the trial court had to submit the issue to the jury. See *Jackson v. Denno,* 378 U.S. at 377–82, 84 S.Ct. at 1781–83.

The United States Supreme Court decided this procedure violated due process because juries could not be trusted to decide these issues fairly and accurately. See *Jackson v. Denno,* 378 U.S. at 386–91, and at 405–06, 84 S.Ct. at 1786–88, and at 1796 (Black, J., dissenting) (juries can be trusted to decide factual issues). Texas apparently followed

---

**11.** Relying on Justice Brennan's dissenting opinion in *Lego,* the majority does say that a " 'lower standard of proof will necessarily result in the admission of more involuntary confessions than would be admitted were the prosecution required to meet a higher standard.' " *Lego,* 404 U.S. at 491–93, 92 S.Ct. at 628 (Brennan, J., dissenting). However, assuming the validity of this proposition, this cuts both ways. A higher standard of proof will necessarily result in the exclusion of more voluntary confessions.

In addition, the majority has said this Court will not "blindly follow" United States Supreme Court precedent in interpreting our constitution.

See *Heitman,* 815 S.W.2d at 690. Yet, we ultimately learn the majority effectively relies on a dissenting opinion from a United States Supreme Court case for its holding in this case. See *Lego,* 404 U.S. at 491–93, 92 S.Ct. at 628 (Brennan, J., dissenting). So, are we now blindly following dissenting opinions from the United States Supreme Court to interpret our constitution?

**12.** But see *Jackson v. Denno,* 378 U.S. at 399–424, 84 S.Ct. at 1793–1805 (Black, J., dissenting), and at 422–28, 84 S.Ct. at 1805–07 (Clark, J., dissenting), and at 426–40, 84 S.Ct. at 1807–14 (Harlan, J., dissenting).

the procedure struck down in *Jackson v. Denno,* 378 U.S. at 378–79 fn. 9, 397–99, and at 405–06, 416–18, 84 S.Ct. at 1782 fn. 9, 1792, and at 1796, 1802 (Black, J., dissenting).

In response to *Jackson v. Denno,* our Legislature was compelled to enact Article 38.22, Section 6,[13] and amend Article 38.23[14] to bring our procedures in line with the federal mandate of *Jackson v. Denno.* Therefore, I would adopt the federal preponderance of the evidence standard since the procedure now before the Court has been federalized as the result of another federal interpretation of the Fourteenth Amendment's due process clause.

I dissent.

KELLER, J., joins this dissent.

**13.** See Acts 1965, 59th Leg., vol.2, p. 317, ch. 722. The procedures set out in Article 38.22, Section 6, are even commonly referred to as a *Jackson v. Denno* hearing.

**14.** See Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.